STATE OF IOWA, *Appellee,* v. E. A. BOGGS, *Appellant.*

Criminal law: CHANGE OF VENUE: PREJUDICE: DISCRETION: EVIDENCE.
1 The court has a discretion in passing upon an application for change of venue. On this application for a change on the ground of local prejudice, the defendant being charged with embezzlement of funds collected as agent of a bank, the evidence of prejudice, consisting chiefly of newspaper publications, is not such as to render a denial of the application an abuse of discretion.

Same: INDICTMENT: DEMURRER: SUFFICIENCY: MOTION IN ARREST.
2 The statutory demurrer to an indictment that it does not substantially conform to the requirements of the Code is a plea in abatement, within the meaning of the statute providing that objections to matters of form and substance, which might be raised by plea in abate-

ment, will be deemed waived if not raised before the jury is sworn; but a demurrer stating generally that the indictment, which charged defendant with embezzlement of funds collected by him as agent of a bank, did not conform to the requirements of the code, was not sufficiently specific to raise the objection that it failed to state the name of the person from whom the funds were collected; and for that reason the objection was not available to defendant in a motion in arrest of judgment.

**Same:** EMBEZZLEMENT: EVIDENCE. On this prosecution for embezzlement of funds collected by defendant as agent of a bank, the evidence is held sufficient to sustain a finding that a certain contract which was collected had been deposited with the bank as security for defendant's general indebtedness to the bank.

**Same:** EMBEZZLEMENT: AGENCY: EVIDENCE. The evidence is also held sufficient to show that in the collection of the contract the defendant was acting as the agent of the bank, and not in his own right.

**Same:** EMBEZZLEMENT: BURDEN OF PROOF. Under a charge of embezzlement the burden is upon the state to prove defendant's fraudulent intent; mere proof of conversion would not of itself sustain the charge.

**Same:** INTENT: EVIDENCE. Evidence of other similar fraudulent transactions is admissible in a prosecution for embezzlement, for the purpose of showing a fraudulent intent in the commission of the crime charged; and the question of whether their fraudulent character has been established is for the jury.

**Same:** EVIDENCE: ADDITIONAL TESTIMONY: NOTICE. Witnesses for the state who were before the grand jury, were examined and minutes of their testimony attached to the indictment, may testify upon the trial to matters not inquired about by the grand jury without notice to defendant of such additional testimony.

*Appeal from Grundy District Court.*—HON. CHAS. E. RANSIER, Judge.

MONDAY, JUNE 22, 1914.

PROSECUTION for larceny by embezzlement. The defendant was indicted under Code § 4842. The specific charge was that he fraudulently embezzled and converted to his own use

the sum of $350 collected by him as agent of, and for the use
of, the Farmers' Savings Bank of Morrison, Iowa. There was
a verdict and judgment of guilty, and the defendant appeals.
—*Affirmed.*

*J. C. Murtagh, F. F. Dawley* and *C. E. Wheeler,* and *Chas.
T. Rogers,* for appellant.

*Geo. Cosson,* Attorney General, *A. B. Lovejoy,* and *Wil-
liamson & Willoughby,* for the State.

EVANS, J.—The Farmers' Savings Bank was a corporation
doing business at Morrison, Grundy county, Iowa. It had a
capitalization of $10,000. The witness Reimers was its cashier
and had its active management. The witness Porter was its
president and principal stockholder. He was also cashier of
the Reinbeck State Bank. The witness Kingsbury was assist-
ant cashier of the Reinbeck State Bank, and was also interested
in the bank at Morrison. The defendant resided at Waterloo,
and was engaged in the granite and monument business. His
business consisted of taking and filling orders for monuments,
and his territory extended to all parts of the state. His method
of doing business was to obtain from the customer a written
order for a monument and a written promise to pay a fixed
sum therefor. In August, 1910, he appeared at the bank at
Morrison and made the acquaintance of Reimers and then and
there borrowed the sum of $500. He put up with Reimers at
the same time written contracts of customers for monuments
for the amount of the loan. A few days later he borrowed
more, and then more, and then more, until he had borrowed
the sum of $62,000 within a period of less than one year. In
connection with the earlier loans obtained, contracts to an
equal amount were put up with Reimers; but the amount of
the later loans obtained soon outstripped the contracts put up,
so that in August, 1911, the indebtedness of $62,000 had no

other security behind it than monument contracts to the extent of about $12,000. The state introduced evidence to the effect that these contracts were indorsed in blank and delivered to Reimers as collateral security to the sum total of indebtedness; also that, at the time Reimers agreed to make loans upon such collateral, the defendant agreed to do all the collecting of such collateral security and to turn the proceeds thereof into the bank.

The defendant testified that the contracts in question were not left with Reimers as *collateral security*, but were left with him for safe-keeping only, and that the defendant reserved to himself at all times the full title and control of such contracts.

Among the contracts indorsed and delivered to Reimers was one for $350, signed by F. E. Nelson. On November 9, 1911, the defendant collected the same, and converted the proceeds to his own use. This prosecution is based upon the alleged fraudulent conversion of the proceeds of the Nelson contract. The principal issues of fact upon the trial were:

(1) Was the Farmers' Savings Bank the holder of such contract as collateral security at the time of its collection?

(2) Was the defendant acting as agent for such bank in the collection of the same?

(3) Did he act with fraudulent intent in the conversion of the same?

These issues were submitted to the jury with express instructions in relation thereto. The necessary effect of the verdict was to find adversely to the defendant on each issue.

Before the trial an application for a change of venue from Grundy county was presented by the defendant. After the verdict a motion in arrest was filed on the ground of the insufficiency of the indictment. The foregoing outline is sufficient as a preliminary statement to a more detailed consideration of the specific errors assigned.

I. Appellant's first complaint is directed to the refusal of his application for a change of venue from Grundy county.

The ground of the application was alleged local prejudice in such county. The application was in statutory form, and was supported by the affidavits of three persons. It was further supported by the showing of certain newspaper publications which are alleged to have inflamed the public mind.

1. CRIMINAL LAW: change of venue: prejudice: discretion: evidence.

Under Code, section 5348, the court is charged with the duty of "the exercise of a sound discretion" in passing upon such application. The question before us is whether such discretion was abused by the district judge in the present case. A careful examination of the record satisfies us otherwise. The showing on behalf of defendant, if it stood uncontradicted, was not strong. The bank at Morrison was owned by comparatively few persons, and these owners bore all the loss inflicted by the heavy borrowing of the defendant. Depositors were not affected. The resentment usually attendant in a community where many people have suffered loss was not present. That such a transaction as here outlined could not escape public notice goes without saying. But this would be true at any time or place whenever or wherever it should receive publicity, regardless of the particular locality. The principal complaint is directed against certain newspaper publications. The only publications shown in Grundy county were those of the Grundy Democrat, the Grundy Republican, and an unnamed paper at Reinbeck. The first publication occurred in January, 1912, in the Grundy Democrat, and this purported to be a rehearsal of testimony given by Boggs himself in a certain hearing at Waterloo before a referee. We infer from the record that this was a proceeding for the discovery of assets. The only sensation in the publication was the story of the defendant himself as to his financial relations to the bank at Morrison and other creditors. There was nothing inflammatory in any of these articles. In one of them the defendant is referred to as "Get-Rich-Quick-Wallingford Boggs." This expression is pressed upon our attention. It would require undue sensibilities to see in this expression in a newspaper

article evidence of such local prejudice in Grundy county as would warrant the district court in granting a change of venue. Readers of newspapers put up with more lurid expressions every day and forget them as readily as they read them. The other publications presented in support of the application occurred in the Waterloo newspapers. It was shown that these papers circulated in Grundy county. The extent of the circulation was not shown. These publications dealt principally with the evidence of the defendant while it was being given before the referee in January, 1912, as before indicated. No attempt was made to show to what extent these articles were read in Grundy county. These articles were necessarily sensational in their facts, in that they reproduced the testimony of the defendant. But they were not inflammatory in any other sense. Indeed, some of their intimations were that the defendant would be able to clear himself and to put the blame on other shoulders. These are indicated by the following excerpts:

Mr. Boggs has promised to give an accounting of his investment of the funds secured by him.

It developed yesterday that Mr. Boggs has no assets and that he has lost all the money in an effort to build up the business of the granite company, which he attempted to re-establish on a paying basis after it had all but gone out of existence through financial embarrassments.

### Put Money into Works.

According to those interested in the prosecution of the case, it is believed that Mr. Boggs either gambled away some of the money in his or another's name or that he has a large sum "salted down" somewhere. Mr. Boggs, however, denies the allegation, declaring that he has expended every dollar of it in an attempt to place the Iowa Granite Company on a paying basis.

The examination of Mr. Boggs, was commenced at the instance of Attorney H. B. Bois for the plaintiff bank. Judgment in the sum of $2,000 had been rendered against the defendant and the sheriff returned the execution unsatisfied.

## People are Amazed.

Seldom are the people of Waterloo confronted with a case so full of amazing incidents and the courthouse today is likely to present a lively scene when the time approaches for the hearing.

It is expected that Mr. Boggs will tell all he knows about the money and the uses to which it was put. One of the things that seem extraordinary to the average citizen is the self-confidence exhibited by Mr. Boggs, who appears to feel that everything will come out all right and who is much incensed at the notoriety given him and his methods by the newspapers.

## Papers Copy the Story.

So remarkable was the case with which Mr. Boggs is said to have secured the vast amounts from the bankers and other individuals that the stories appearing in Waterloo papers have been copied from one end of the country to the other, many of the big dailies featuring the story.

Friends of the witness are satisfied that he can explain in detail just exactly where the money and while admitting he made serious mistake in trying to finance the company as long as he did the consensus of opinion seems to be that he has some way or other ''salted'' a large amount.

## Monumental Blunders.

Mr. Boggs while on the witness stand at the hearing on Monday stated that he would tell how the money was spent and it is likely that more light will be cast on the whole business today.

The majority of the opinions heard favor Mr. Boggs in the fact that they seem to set the whole matter down as a monumental or series of monumental blunders rather than to attach criminal intent to the transactions.

The examination of the jurors who were called into the box in the progress of the trial has been set before us in full. We have read this record for such light as it may afford. We think it fully confirms the judgment of the district court in refusing the change of venue. Comparatively few of the jurors examined had read the newspaper articles which are set

up in the record. Of those who had read them the majority had forgotten what they had read. Defendant exercised a number of challenges for cause, and all were sustained. The defendant accepted the particular jury without exhausting his peremptory challenges. He made no objections at any time to any juror who served upon the case. We think it clear that the discretion of the trial court at this point was fairly exercised. *State v. Williams,* 63 Iowa, 135; *State v. Foster,* 91 Iowa, 164.

II. The defendant assails the sufficiency of the indictment,- because it fails to state the name of the person from whom the defendant collected the funds which he later embezzled, as alleged. As already indicated, the indictment is based upon section 4842. The indictment follows the language of the statute. The contention of appellant is that the name of the person from whom the defendant collected funds was one of the essential "facts constituting the offense," within the meaning of section 5280; and that it was one of the "particular circumstances . . . necessary to constitute a complete offense," within the meaning of section 5282; and that it was necessary to state such fact "to enable a person of common understanding to know what is intended," within the meaning of section 5289. The point here made has never been passed upon heretofore by this court. Appellant cites a number of cases from other jurisdictions wherein it has been held necessary to allege in the indictment the name of the person from whom the embezzled funds were received. The cited cases, however, all involve embezzlements by bailees. They all recognize a distinction between embezzlement by bailee and that by a person acting as an agent. Whether the distinction is such as to justify a different requirement of allegation in the indictment we will not now stop to consider. Decisions in other states necessarily rest upon their own respective statutes, and these are seldom identical.

The question here presented was first raised by motion in

2. SAME: indictment: demurrer: sufficiency: motion in arrest.

arrest of judgment. It is urged by the state that the objection came too late, and that the defendant is precluded from making it by the recent enactment of the Legislature. Chapter 227, Acts 33d General Assembly. Section 9 of such chapter is as follows:

9. All objections to the indictment relating to matters of substance and form which might be raised by a plea in abatement shall be deemed waived if not raised by the defendant before the jury is sworn on the trial of the case.

It is urged, therefore, that the objection now made is one which under the provisions of this new legislation, should have been made before trial. The defendant did demur to the indictment on the general ground as follows:

That it does not substantially conform to the requirements of the Code.

It is his contention now that this demurrer necessarily raised every question and assailed every defect in the indictment. This argument is based upon the theory that such demurrer conformed to the statutory form as prescribed in section 5328. Such section is as follows:

The defendant may demur to the indictment when it appears upon its face, either:
1. That it does not substantially conform to the requirements of this Code;
2. That the indictment contains matter which, if true, would constitute a legal defense or bar to the prosecution.

It will be noted that the first paragraph of the section relates to defects in the indictment, viz., failure to conform to statutory requirements.

The second relates to affirmative matters appearing upon the face of the indictment which of themselves constitute a bar to the prosecution. The requirements of an indictment are

set forth in numbered paragraphs in sections 5280 and 5289. Can it fairly be said that the demurrer before us fairly raised the question of the alleged defect in the indictment in failing to state the name of a person, so as to meet the requirement of section 9, Chapter 227, Acts 33d General Assembly, as above quoted. To so hold would be to reduce such legislation to nothing. If the defendant was entitled to more specification in the indictment, it would be on the ground that he was entitled to be advised in advance of the particular charge which he was called upon to defend against. The very purpose of the later legislation is to require that such questions shall be raised and determined in advance of a trial, rather than afterwards. The defendant necessarily knows at that time whether he is sufficiently advised of the particular charge made against him. There is no claim in the case at bar of any actual surprise on the part of the defendant or his suffering any disadvantage in preparing his defense for want of specific allegation as to the name of Nelson. Indeed, he testified on the trial that he understood that the indictment had reference to the Nelson case, and that he prepared his defense accordingly. This, of course, would not cure the defect, if any, in the indictment. But it is illustrative of the artificiality of a defendant's technical right to a perfect indictment, and of the evil sought to be reached by the later legislation.

The question arises whether section 9 above quoted is sufficient in its terms to cover objections to the indictment which could have been raised only by demurrer. The language of such section refers to objections "which might be raised by plea in abatement." Can a demurrer be said to be the equivalent of a "plea in abatement," within the meaning of this section? The term "plea in abatement" is manifestly used in contra-distinction to a "plea in bar." Attack upon an indictment for defect or insufficiency of statement is an attack in abatement. If successful, judgment thereon will not operate as a bar to further prosecution. Code, sections 5326, 5341. There is no provision in express terms in our statutes for a

"plea in abatement" to an indictment. The function of such plea is provided for by a demurrer on the first ground stated in section 5328. No other method of attack in abatement for defect of form in the indictment is provided. As a mere matter of technical terminology, therefore, it may be urged that section 9 is rendered nugatory by the inaccuracy of its terms. However, a demurrer is a "pleading." Code, section 5327. On the other hand, it must be conceded that it is not a "plea to the indictment," within the meaning of section 5333, which limits such pleas to three forms. The cited sections are as follows:

Section 5327. The only pleading on the part of the defendant is a demurrer or plea.

Section 5333. There are but three pleas to the indictment—(1) guilty, (2) not guilty, or (3) of a former judgment of conviction or acquittal of the offense charged.

In a broad sense, however, a "pleading" and a "plea" are synonymous in many respects. They are so treated in the dictionaries. Among the definitions of "plea" in Webster's New International Dictionary, is the following:

2. Law. An allegation made by a party in support of his cause; a pleading. . . .

4. That which is alleged or pleaded, in defense, excuse, or justification; a pleading.

If the language of section 9 had purported to refer to objections which might be raised by "pleading in abatement," there could be no question of its application to the case before us. We think it very manifest that such is the sense in which the expression "plea in abatement" is used in such section. We hold, therefore, that a demurrer upon the first ground of section 5328 is a "plea in abatement," within the meaning of section 9, chapter 227, Acts 33d General Assembly. We hold further that the demurrer filed by the defendant in this case

was not sufficiently specific to raise the objection now urged as a defect in the indictment, and that therefore such objection is not now available to the defendant by a motion in arrest.

III. It is urged by the defendant that the evidence was insufficient to show that he had ever deposited the Nelson contract with the Farmers' Savings Bank as collateral security for his

3. SAME: embez-
zlement: evi-
dence.

general indebtedness. We have already referred to the general nature of the conflicting claims between the defendant and the witnesses for the prosecution at this point. While the defendant denied broadly that any of these contracts were ever put up by him as collateral security, he did admit as to this Nelson contract that he did put that up as collateral security to a specific $1,000 loan. He contended further that such loan was subsequently paid, and that the collateral was thereby released. He testified also that he first put it up with the bank on January 24, 1911. His testimony, however, in this regard was contradicted. Reimers' testimony was that the contract was put up in the fall of 1910; that it was put up primarily as collateral to a note known in the record as No. 2416, which has never been paid; also that all the contracts were put up as collateral for any balance of indebtedness that might be due. The admitted circumstances are all quite inconsistent with the claim of the defendant at this point. Many letters appear in the record which passed between the defendant, on the one hand, and Reimers, Porter, and Kingsbury, on the other. They make frequent reference to the "collateral" contracts. Lists of names of the makers appear in the correspondence, including the Nelson contract, and this at a date subsequent to the payment upon which defendant relies as a discharge of this collateral.

It is sufficient to say that the evidence was abundant to sustain the finding of the jury that the Farmers' Savings Bank was the holder of the Nelson contract as collateral security for its debt on November 9, 1911.

IV. It is next urged that the evidence was insufficient to show that at the time of the collection of the Nelson contract the defendant sustained the relation of agent to the Farmers' Savings Bank as holder of the collateral. It may be doubted whether, under the provisions of section 4842, it was strictly essential for the state to show that the defendant sustained the relation of agent to the bank as a principal. *State v. Brooks,* 85 Iowa, 366. But the trial court solved the doubt at this point in favor of the defendant, and instructed that such agency must be shown. We must deal with the question accordingly. The evidence on behalf of the prosecution was that one of the inducements to Reimers for the making of the loan was that the defendant would attend to the collection of the contracts, and that he would bring the proceeds of such collections to the bank and take up the contract therewith. In all their future dealings Boggs did collect all that was collected upon such contracts. He sometimes obtained the contracts from the bank for the purpose of collection; and at other times he collected the contracts without the possession of the same and brought the proceeds to the bank. In the Nelson case he collected the amount without the possession of the contract; that remaining in the actual possession of the bank. On the other hand, the defendant testified that he did not put up the contracts as collateral security, but as exhibits merely of the extent of his business. He testified further that he expressly reserved the full control of the same and the right to collect the same. It is argued, therefore, that in the collection of the contracts he was simply exercising a right stipulated for by contract, and that he was necessarily acting in his own right, and not as the agent of another. It is further urged that he neither received nor stipulated for compensation for such services, and therefore he must have been acting in his own right and behalf, and not as agent of another. Defendant's contention at this point would be more plausible if there were any denial of his authority to make the Nelson

4. SAME: embezzlement: agency: evidence.

collection. Such authority is conceded. He is not charged with any wrongdoing at that point. The fact that he agreed to collect these contracts at the time he put them up was not necessarily inconsistent with the alleged agreement that they were put up as collateral. True, as between it and third parties, the bank took the risk of such an arrangement. But it was legally competent for the defendant to agree with the bank to make all such collections for it, and competent for the bank to trust his integrity for that purpose. If the defendant did put up such contracts as collateral security, and if he did agree to collect such contracts for the bank, then to such extent and for that purpose only he was an agent. The fact that such agency was special and limited is not controlling, nor was it essential that there should be compensation.

V. It is next urged that the dealings between the parties show conclusively that it was never contemplated that the defendant should, upon collecting a contract, pay the bank the identical money or proceeds of such collection. It is urged that his uniform practice was to pay all his collections into his own general account at his bank in Waterloo, and to remit to the Farmers' Savings Bank the appropriate amount by draft. It is urged therefore that, unless the Farmers' Savings Bank was entitled to receive from him the identical money which he received from Nelson, he could not be guilty of embezzlement. The question of the identity of money or of the proceeds of collection is not controlling. This question enters into the case only in an incidental way. The gist of the charge against the defendant is not that he wrongfully mixed the proceeds of the collection with his own money and lost its identity. It is that, having rightfully collected the money for the use of the bank, he not only converted the same to his own use, but that he did so with a fraudulent mind. If he had simply passed the money into his own account at the bank, and had thereby lost its identity without fraudulent intent, he would

5. SAME: embezzlement: burden of proof.

not be amenable to this indictment. And this answers the claim of the defendant that his only offense against the bank was his failure to pay. His failure to pay was one of the facts which tended to support the broader charge of fraud. The instructions of the trial court protected the defendant with considerable emphasis at this point.

These were in substance that the mere conversion of the money was not sufficient of itself to prove the charge of embezzlement. The burden was laid upon the state to prove the fraudulent intent.

VI. The state introduced evidence of four or five other similar transactions wherein the defendant was alleged to have embezzled the proceeds of the collections of other contracts held by the same bank as collateral. This evidence was offered for the purpose of proving fraudulent intent.

6. SAME: intent: evidence.

The general rule that evidence of other similar transactions may be put in evidence on the question of intent is so well settled and has been so often applied that we need not refer to the long array of authorities in support thereof. The defendant concedes it. The defendant urges however, that it was not shown that these other transactions were fraudulent. The state, however, did introduce evidence tending to show that they were fraudulent and tending to show that the acts were of the same wrongful character as that charged in the indictment. This was sufficient to admit the testimony.

Whether the testimony was sufficient in fact to establish their fraudulent character rested ultimately with the jury. The trial court protected the defendant at this point, and instructed the jury, in substance, to give no consideration to the evidence of such other transactions, unless they found such evidence sufficient to establish their fraudulent character. This instruction was clearly for the benefit of the defendant. But he assails it here on the ground that it directed the jury to rule on the evidence, and thereby to

determine whether the evidence was admissible or not. It is argued that it was incumbent upon the court to determine the admissibility of all the evidence, and that the jury could have nothing to do with such question. The argument is not applicable to the record. The court did not direct the jury to rule upon the evidence. The court did rule that the evidence was admissible, in that it tended to show fraud in such transactions. The court had no power to determine in advance that the other transactions put in evidence were fraudulent in fact or that they were not. The evidence was admissible. Its value as a circumstance depended upon the sufficiency of the proof as to fraudulent intent as to each circumstance. The sufficiency of such proof was a question which rested with the jury. It was the duty of the court to so advise the jury. It did so.

VII. Complaint is made that certain of the witnesses of the state who were witnesses before the grand jury testified upon the trial upon subjects which were not included in the minutes of their testimony attached to the indictment, and particularly upon the subject of defendant's agency. The witnesses specified are Reimers, Porter, and Kingsbury. These were all before the grand jury, and the minutes of their testimony were attached. The substance of their testimony on the trial was the same as appeared in the minutes attached to the indictment. It is urged that they did not testify before the grand jury on the subject of agency, and that therefore the defendant was entitled to notice of their additional testimony on that subject. We have repeatedly held otherwise, beginning with *State v. Bowers,* 17 Iowa, 46, and *State v. Ostrander,* 18 Iowa, 435. See, also, *State v. Rainsbarger,* 74 Iowa, 196, and *State v. Perkins,* 143 Iowa, 55.

7. SAME: evidence: additional testimony: notice.

No case holds to the contrary. Appellant relies on *State v. Kreder,* 86 Iowa, 25. That case deals with the question of notice of testimony of witnesses who were not examined before the grand jury. Such is not the question presented here.

The foregoing disposes of the principal questions presented. The record is quite voluminous, and we cannot deal with it in further detail. Complaint is made of the failure of the trial court to allow sufficient latitude to the defendant on the question of good faith in the use of the funds. We think there was no abuse of discretion at this point. Large latitude was permitted, and especially as to the use of the proceeds of the Nelson collection. Some miscellaneous details which do not appear to have been immediately connected with the acts under investigation were ruled out. We think the rulings in this respect were proper.

The defendant appears to have had a fair trial. We can discover nothing in the record which would justify our interference with the judgment.

The judgment of the trial court is therefore—*Affirmed.*

LADD, C. J., and WEAVER and PRESTON, JJ., concur.